EXHIBIT 1



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

REGION IX
CALIFORNIA

50 UNITED NATIONS PLAZA
MAIL BOX 1200; ROOM 1545
SAN FRANCISCO, CA 94102

March 12, 2018

**SENT VIA ELECTRONIC MAIL ONLY**

C.L. Max Nikias
President
University of Southern California
ADM-110, MC0012
Los Angeles, California 90089

(In reply, please refer to OCR case numbers 09-13-2294 and 09-16-2128.)

Dear President Nikias:

This letter is to inform you that the U.S. Department of Education (the Department), Office for Civil Rights (OCR), has completed its investigation of the above-referenced complaints against the University of Southern California (University). On June 26, 2013, OCR accepted for investigation a complaint (OCR case no. 09-13-2294) filed by students on behalf of themselves and other students alleging that the University failed to respond promptly and equitably to reports of sexual harassment or sexual violence in violation of Title IX of the Education Amendments of 1972 (Title IX), as amended, 20 U.S.C. § 1681 et seq., and its implementing regulations, at 34 C.F.R. Part 106. Subsequently, OCR received a complaint against the University filed by another individual raising similar allegations and an allegation regarding denial of counseling services on the basis of sex, which OCR accepted for investigation on March 9, 2016 (OCR case no. 09-16-2128).

This letter and the enclosed resolution agreement (Agreement) address and resolve OCR's findings regarding the OCR complainants, C1, C2, C3, C4, and C5.[1] They also address OCR's findings regarding the University's compliance with Title IX with respect to its development and dissemination of notice of nondiscrimination and sexual harassment and sexual violence policies and procedures and its designation and notice of a Title IX Coordinator for the 2010-2011 through 2015-2016 academic years. In addition, this letter and the enclosed Agreement address OCR's review of University investigative reports issued from August 2010 through May XX, 2015 in response to complaints of sexual harassment and sexual violence. OCR has not reviewed any cases after May XX, 2015, other than C5's case. OCR also has not reviewed the University's policies and procedures for the 2016-2017 or 2017-2018 academic years. Accordingly, OCR makes no findings in this letter as to any University policies, procedures or practices outside of the stated periods of review.

OCR is responsible for enforcing Title IX and its implementing regulations, which prohibit discrimination on the basis of sex in programs and activities receiving financial assistance from the Department. The University is a recipient of financial assistance from the Department. Therefore, OCR had jurisdiction to investigate this matter under Title IX. OCR investigated the following issues:

---

[1] OCR notified the University of C1, C2, C3, C4, and C5's identities when the investigation began. OCR is withholding their names from this letter to protect their privacy.

The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.

www.ed.gov

Case 2:20-cv-09539-DSF-RAO   Document 41-3   Filed 05/02/22   Page 3 of 32   Page ID
#:3046
Page 2 of 31: 09-13-2294 and 09-16-2128

A.  Whether the University complied with Title IX requirements regarding the development and dissemination of a notice of nondiscrimination pursuant to 34 C.F.R. § 106.9;

B.  Whether the University complied with Title IX requirements regarding the designation and notice of a Title IX Coordinator pursuant to 34 C.F.R § 106.8(a);

C.  Whether the University's sexual harassment and sexual violence policies and procedures, as written, complied with Title IX and the regulations pursuant to 34 C.F.R § 106.8(b);

D.  Whether the University provided a prompt and equitable response to incidents of sexual harassment and sexual violence of which it had notice, including incidents reported by five individuals – C1, C2, C3, C4, and C5 – pursuant to 34 C.F.R. §§ 106.31 and 106.8;

E.  Whether the University's failure to provide a prompt and equitable response to oral reports and written complaints of sexual harassment and sexual violence allowed affected students to be subjected to or to continue to be subjected to a sexually hostile environment in violation of 34 C.F.R. §§ 106.31 and 106.8; and

F.  Whether the University discriminated against complainant C5 and other male students by denying counseling for sexual harassment and sexual violence at the Center for Women and Men (CWM)/Relationship and Sexual Violence Prevention and Services (RSVP)[2] based on their sex in violation of 34 C.F.R. § 106.31.

BACKGROUND

The University is a private university located in Los Angeles, California with approximately 43,000 students. While students may report sexual harassment and sexual violence to any University employee, students are encouraged, and generally do, report them to the University's campus police department, which is called the Department of Public Safety (DPS), or the Title IX Office within the Office of Equity and Diversity (OED). Students who seek confidential counseling services through the CWM/RSVP can receive assistance and support from a counselor in making a report of sexual assault to DPS or the Title IX Office.

Prior to fall 2013, all oral reports and written complaints of sexual harassment and sexual violence against students were investigated by the Office of Student Judicial Affairs and Community Standards (SJACS); starting in fall 2013 and through May XX, 2015, all oral reports and written complaints against students were handled by designated Title IX investigators who were overseen by the OED director.  During the period of the investigation, all oral reports and written complaints of sexual harassment and sexual violence against faculty, staff, and third parties were investigated by the OED.

OCR notes that from the 2010-2011 through the 2015-2016 academic year, the University took proactive steps to continually update its policies and procedures.  The University also conducted a campus climate survey in the 2014-2015 academic year, the results of which were shared with the University community and used to develop the University's Title IX educational programming; provided regular Title IX training to students and employees; and expanded the scope of its Title IX training and sexual harassment prevention training.

---

[2] The Center for Women and Men (CWM) was renamed Relationship and Sexual Violence Prevention (RSVP) in June 2016.  CWM/RSVP states that its purpose is to provide confidential counseling services to individuals who have experienced sexual harassment and sexual violence and to offer educational programs to prevent sexual violence.

SUMMARY OF INVESTIGATION

OCR reviewed documentation submitted by the University and the five OCR complainants, including: the University's Title IX policies and procedures, notices of nondiscrimination and information about Title IX provided to students, faculty members and staff for the 2010-2011 through 2015-2016 academic years; descriptions of training on sexual harassment and sexual violence for the 2010-2013 academic years for students, faculty members, and staff; 110 University investigative reports issued from August 2010 through May XX, 2015 related to complaints of sexual harassment and sexual violence, including C1-C4;[3] and the University's investigative files for the allegations of the five OCR complainants.  Other than C5's case, as part of this investigation, OCR did not receive or review the University's response to any oral reports or written complaints of sexual violence or sexual harassment from May XX, 2015 through the date of this letter's issuance.

OCR interviewed 43 University-affiliated personnel, including but not limited to counselors, University police, the Vice Provost for Student Affairs, the Director of Fraternity and Sorority Leadership, the Senior Associate Dean of Students, the Director and Assistant Director for Student Support and Advocacy, the Athletic Director, Title IX Coordinators, the Associate Director of Residential Coordinators, and select members of the Student Equity Review Panel and appeals committees.  OCR conducted individual interviews with each complainant and eight other former and current students.  During two one-week on-site visits to the University in April 2014, OCR conducted focus group interviews with more than 100 students.

LEGAL STANDARDS

*Sexually Hostile Environment and Duty to Respond Promptly and Equitably*
The regulations implementing Title IX, at 34 C.F.R. § 106.31, provides that "... no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any ... education program or activity" operated by recipients of Federal financial assistance.

Sexual harassment that creates a hostile environment is a form of sex discrimination prohibited by Title IX.  Sexual harassment is unwelcome conduct of a sexual nature.  Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature, including acts of sexual violence.

When a student sexually harasses another student, the harassing conduct creates a hostile environment if it is so severe, persistent, or pervasive that it denies or limits a student's ability to participate in or benefit from the recipient's program or activities.  If a recipient knows or reasonably should know about student-on-student harassment, Title IX requires the recipient to respond in a prompt and equitable manner by taking immediate action to stop the harassment, prevent its recurrence, and address its effects.

If an employee who is acting, or reasonably appears to be acting, in the context of carrying out his/her responsibilities either (1) conditions an educational decision or benefit on a student's submission to unwelcome sexual conduct, or (2) engages in sexual harassment that is so severe, persistent, or pervasive

---

[3] This investigation did not include a review of any reports or complaints that were resolved with notice of the investigation issued to the parties after May XX, 2015 through the date of this letter, except for the case of C5.  OCR, therefore, is not making any findings or identifying any compliance concerns related to reports or complaints made to the University in the years not covered by the investigation.

Case 2:20-cv-09539-DSF-RAO   Document 41-3   Filed 05/02/22   Page 5 of 32   Page ID
#:3048
Page 4 of 31: 09-13-2294 and 09-16-2128

to deny or limit a student's ability to participate in or benefit from the recipient's programs or activities, the recipient is responsible for the discriminatory conduct whether or not it has notice.

When responding to alleged sexual harassment, a recipient must take immediate and appropriate action to investigate or otherwise determine what occurred. The inquiry must be prompt, reliable, and impartial. Pending the outcome of a response to a report or an investigation of a complaint, Title IX requires a recipient to take steps to protect the complainant from further harassment as necessary, including taking interim measures. The recipient also should take steps to prevent any retaliation against the student who made the complaint and/or those who provided information. A recipient must consider the effects of off campus misconduct when evaluating whether there is a hostile environment on campus or in an off campus education program or activity.

Title IX and its implementing regulations are intended to protect students from discrimination on the basis of sex, not to regulate the content of speech. In cases of alleged sexual harassment, OCR considers the protections of the First Amendment of the U.S. Constitution where issues of speech or expression by students or employees are concerned.

*Grievance Procedures and Notice of Nondiscrimination and Title IX Coordinator*
The regulations implementing Title IX, at 34 C.F.R. § 106.8(a), require each recipient to designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under the regulations implementing Title IX (Title IX Coordinator), including investigation of any complaint communicated to the recipient alleging any actions which would be prohibited by the regulations implementing Title IX. The regulations implementing Title IX, at 34 C.F.R. § 106.8(b), require that a recipient adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee complaints alleging any action prohibited by the regulations.

The regulations implementing Title IX, at 34 C.F.R. § 106.9, require each recipient to implement specific and continuing steps to notify applicants for admission and employment, students and parents of elementary and secondary school students, employees, sources of referral of applicants for admission and employment, and all unions or professional organizations holding collective bargaining or professional agreements with the recipient, that it does not discriminate on the basis of sex in any educational program or activity which it operates, and that it is required by Title IX and its implementing regulations at 34 C.F.R. Part 106 not to discriminate in such a manner. This notice of nondiscrimination must include a statement that inquiries concerning Title IX may be referred to the Title IX Coordinator or to OCR and must include contact information, including the name (or title), address, and phone number for the Title IX Coordinator.

*Different Treatment on the Basis of Sex*
Under the Title IX regulations, at 34 C.F.R. § 106.31(a) and (b), a recipient may not treat individuals differently on the basis of sex with regard to any aspect of services, benefits, or opportunities it provides. To determine whether a student has been discriminated against on the basis of sex under Title IX, OCR looks at whether there is evidence that the student was treated differently than students of the other sex under similar circumstances, and whether the treatment has resulted in the denial or limitation of education services, benefits, or opportunities. If there is such evidence, OCR examines whether the recipient provided a legitimate, nondiscriminatory reason for its actions, and whether there is evidence that the stated reason is a pretext for discrimination. For OCR to find a violation, the preponderance of the evidence must establish that the recipient's actions were based on the student's sex.

FACTUAL FINDINGS, ANALYSIS, AND CONCLUSIONS OF LAW

   A.  **Whether the University complied with Title IX requirements regarding the development and dissemination of a notice of nondiscrimination pursuant to 34 C.F.R. § 106.9.**

Findings of Fact, Analysis, and Conclusions of Law

   1.  Notice to Students and Applicants

OCR reviewed the University's notice of nondiscrimination for six academic years from 2010-2016 published in the *University Catalogue*, *Schedule of Classes*, and *SCampus Student Guidebook (SCampus)* and found the following incidents of noncompliance:

- Fourteen out of the 17 *Schedule of Classes* published from fall 2010 through spring 2016 (published three times a year, one for each term) contained a nondiscrimination statement on the basis of sex for employees and applicants for employment only, and did not encompass students and applicants for admission.[4]
- The 2010-2013 *SCampus* (published annually[5]) also prohibited discrimination on the basis of sex for employees and applicants for employment only, with no reference to students and applicants for admission.
- In 2010-2013, none of the notices reviewed by OCR informed students that they could contact OCR with inquiries about Title IX.  OCR was first identified in the 2013-2014 *SCampus*, but no contact information was provided (no phone number, e-mail or web address, or office location).  The 2015-2016 *SCampus* provided OCR's contact information, including phone number and e-mail address.

In summary, OCR found the University out of compliance with Title IX and its implementing regulations at 34 C.F.R. § 106.9 for all six academic years investigated because the statement of protected bases was not compliant in several documents, including in 14 of the 17 *Schedule of Classes* from 2010-2016 and in the *SCampus* for 2010-2013.  In addition, the notice provided to students in 2010-2013 did not inform them that inquiries under Title IX may be made to OCR.

   2.  Notice to Faculty and Staff

OCR reviewed the University's notice of nondiscrimination provided to faculty and staff for six academic years, from 2010-2016.  For faculty, OCR reviewed the nondiscrimination statement in the *Faculty Handbook* published in 2010, 2012, 2014, and 2015, and found:

- The 2010 and 2012 *Faculty Handbooks* directed all questions and complaints to OED and provided OED's phone number but did not include the Title IX Coordinator's name or title (or otherwise state that the executive director of OED was also the Title IX Coordinator) or provide the office address.
- The nondiscrimination statement in the 2014 *Faculty Handbook* identified the Title IX Coordinator by name and title and provided an office address but not the phone number.
- The nondiscrimination statement in the 2015 *Faculty Handbook* identified the Title IX Coordinator by name but did not provide her phone number or office location.
- All four *Faculty Handbooks* included information about filing complaints with government agencies; the earlier *Faculty Handbooks* (2010 and 2012) did not mention OCR, but did mention the California

---

[4] This includes all versions, except for summer 2012, summer 2013, and fall 2013.
[5] In 2014-2015, the University published two versions of *SCampus*, the second in March 2015.

Department of Fair Employment and Housing and the U.S. Equal Employment Opportunities Commission.  The 2014 *Faculty Handbook* included a referral to the "Office for Civil Rights," but it was for the U.S. Department of Health and Human Services.  OCR was correctly referred to for the first time in the 2015 *Faculty Handbook*, which included OCR's phone number and web address.

For all academic years under review (2010-2016), staff members were governed by the "Equal Opportunity, Affirmative Action and Non-Discrimination" policy (*Nondiscrimination Policy*), effective December 1, 2011, which prohibited discrimination against students, faculty, staff, and applicants for admission and employment on the basis of sex and gender.  For the academic years under review, the *Nondiscrimination Policy* on the University website identified the Title IX Coordinator by name, and provided her office address and phone number.  The *Nondiscrimination Policy* lacked any reference to a government agency, including OCR, to whom inquiries about Title IX could be made.

In summary, from academic years 2010-2011 through 2015-2016, OCR found that the notice provided to faculty in the *Faculty Handbook* was not compliant with Title IX and its implementing regulations at 34 C.F.R. § 106.9 because it did not contain all of the required contact information for the Title IX Coordinator; prior to 2015, the *Faculty Handbook* also did not inform faculty that they could direct Title IX inquiries to OCR, but faculty were directed to other appropriate State and Federal governmental agencies.  In contrast, while the notice provided to staff in the *Nondiscrimination Policy* contained the complete contact information for the Title IX Coordinator, the notice was not compliant with Title IX because it failed to inform staff that inquiries about Title IX could be made to OCR.  However, on January 11, 2018, the University notified OCR that it had revised its notices of nondiscrimination for applicants, students, faculty and staff to be compliant with all requirements and provided the revised documents to OCR for its review and approval.  In addition, the University provided to OCR current links to the University's websites where the revised notice of nondiscrimination is included.  OCR will review this documentation in the monitoring of the enclosed Agreement.

**B. Whether the University complied with Title IX requirements regarding the designation and notice of a Title IX Coordinator pursuant to 34 C.F.R § 106.8(a).**

Findings of Fact, Analysis, and Conclusion of Law

The University had three Title IX Coordinators during the academic years investigated: a coordinator prior to September 2015, an interim coordinator from September 2015 to January 2016, and a current coordinator who started in January 2016.  Based on the information provided in interviews and other documents, OCR found that they had adequate background and training.  Accordingly, during the 2010-2011 through the 2015-2016 academic years, OCR found the University had designated Title IX Coordinators with knowledge about the requirements of Title IX.

**C. Whether the University's sexual harassment and sexual violence policies and procedures, as written, complied with Title IX and the regulations pursuant to 34 C.F.R § 106.8(b).**

The University has developed two procedural tracks for oral reports and written complaints by students alleging sexual harassment and sexual violence: complaints against students, and complaints against faculty, staff, and third parties.  OCR reviewed the University's Title IX policies and procedures (collectively, "Title IX Policies/Procedures") applicable to students, faculty, staff, and third parties for six academic years, from 2010-2011 through 2015-2016.

Case 2:20-cv-09539-DSF-RAO    Document 41-3    Filed 05/02/22    Page 8 of 32    Page ID
#:3051
Page 7 of 31: 09-13-2294 and 09-16-2128

1.  Complaints of sexual misconduct against students

<u>Findings of Fact</u>

Student policies are located in the annual publication of *SCampus,* which is available on the University's
website.  *SCampus* contains the *Student Conduct Code* and University policies against sexual harassment,
sexual assault, and discrimination.  For the six academic years reviewed (2010-2016), the University's Title
IX Policies/Procedures applicable to student misconduct contained definitions for sexual harassment, sexual
assault or misconduct, and consent, as well as grievance procedures for reporting and responding to
complaints alleging sexual harassment and sexual violence.

*2010-2011 and 2011-2012 Academic Years*
In 2010-2012, the University's complaint procedures were known as the *Conduct Review System*, which
applied not just to sexual harassment cases but more generally to all types of student misconduct.  Under
the *Conduct Review System*, the burden of proof rested upon the complainant.  The standard of proof was
the preponderance of the evidence standard.  Respondents received specific procedural rights, such as the
right to present witnesses and evidence, and complainants were informed that they would be afforded "the
same general procedural fairness afforded" to respondents, but those rights were not specified.  Under the
*Conduct Review System*, the investigator decided whether a policy violation had occurred, and if so,
determined sanctions.  Both parties were informed of the investigative outcome in writing.  Respondents
received a written decision, including the factual basis for the decision, while complainants were notified of
the "outcome of the review."

The *SCampus* described the appeal process.  Either party could file an appeal within 10 business days
(extensions were permitted), and the other party was notified and given a "reasonable opportunity" to
respond.  There were three grounds for appeal,[6] and all appeals were considered by either the Student
Behavior Appeals Panel (SBAP) or the Peer Review Appeals Panel (PRAP).  Upon its review, the appeal panel
could take one of four actions: uphold the decision, decrease or increase sanctions, remand the case back
to the investigator for further review, or dismiss the case.  Recommendations of SBAP and PRAP could be
reviewed and modified by the Vice President for Student Affairs.  A written decision was issued to both
parties.  The policy did not specify a time frame for completion of the appeal process.  None of the Title IX
Policies/Procedures included an assurance that the University would take steps to stop the harassment and
remedy its effects on the complainant and others, as appropriate.

*2012-2013 Academic Year*
In 2012-2013, the University made the following revisions to its Title IX Policies/Procedures: sexual
harassment and sexual violence had to be reported within two years from the date of the incident,
investigations had to be completed within a 60-day timeframe (extensions possible), and both parties
would receive a summary of findings, including the legal standard and reasons supporting the decision.

*2013-2014 Academic Year*
In 2013-2014, the University made additional revisions.  All student sexual harassment and sexual violence
policies were consolidated into one section (Part E) in *SCampus.*  The University created a separate process
called the *Sexual Misconduct Review* to replace the *Conduct Review System* for investigating complaints of

---

[6] Per Section 15.02, the three grounds were: (1) that new evidence has become available which is sufficient to alter
the decision and which the appellant was not aware of or could not have been reasonably obtained; (2) that the
sanction imposed was excessive or inappropriate; and (3) that the investigator failed to follow University rules or
regulations while reviewing the cited behavior.

Case 2:20-cv-09539-DSF-RAO   Document 41-3   Filed 05/02/22   Page 9 of 32   Page ID
#:3052
Page 8 of 31: 09-13-2294 and 09-16-2128

sexual misconduct.  The two-year limit for reporting sexual assault was removed.  The *Sexual Misconduct Review* specified that the University's jurisdiction included conduct which occurs within the University community, is associated with University related activities, or which adversely affects the University community and/or pursuit of its objectives.  Both parties were informed that they have "equal rights throughout the investigation and appeal process."  Sanctions determined by the investigator were subject to review and modification by the Title IX Coordinator in consultation with the Vice Provost of Student Affairs.  Both parties received the written results of the investigation on the same day, including whether or not there was a violation and the reasons for the determination.  The complainant was given a summary of any sanction imposed on the respondent.  All appeals were routed to the SBAP only (and not to the PRAP).  Upon completing its review, the policy authorized SBAP to take a fifth action, in addition to the four mentioned above: "to modify the factual findings."  At the end of the appeal, both parties received the "final result," including whether a violation had occurred, the reasons underlying the decision, and a summary of any sanction.

*2014-2015 Academic Year*
In 2014-2015, the University changed its Title IX Policies/Procedures two times, once at the beginning of the academic year and once in March 2015.  At the beginning of the 2014-2015 academic year, an explicit reference to interim measures and examples, such as an avoidance of contact letter and rescheduling of exams, were added, and two significant changes were made to the appeal process.  First, the grounds for filing an appeal were modified and expanded from three to four[7], and statements were added to prohibit SBAP from changing the investigator's credibility determinations and making new findings of fact.[8]   In March 2015, the revisions included that:  the University would "consider the effects of off campus conduct in evaluating whether there is a hostile environment on campus" and take appropriate action to eliminate any hostile environment, prevent its recurrence and address its effects; the burden of proof was shifted from the complainant to the University, which was identified as being responsible for gathering the relevant evidence.  The role of making findings of fact was separated from the role of determining whether or not there was a violation and, as applicable, sanction, such that the investigator developed findings of fact to be reviewed by a newly created "Part E Review Panel," which determined whether a violation had occurred, and if so, appropriate sanctions.  For the first time, a 45-day timeframe (extensions allowed) for completing appeals was added.

*2015-2016 Academic Year*
In 2015-2016, the revisions included: adding a voluntary, "informal resolution process" for non-sexual assault matters; specifying jurisdiction over sexual harassment and sexual violence that occurs outside of a University program or activity, if it has continuing adverse effects on campus; and renaming the Part E Review Panel the Student Equity Review Panel.

<u>Analysis and Conclusions of Law</u>

For all six academic years reviewed (2010-2016), OCR found that the information provided to students about how to file a complaint was widely distributed, including in the annual publication of *SCampus* and

---

[7] The four grounds were: new evidence has become available which is sufficient to alter the decision and which the appellant was not aware of or could not have been reasonably obtained; the sanction imposed is grossly disproportionate to the violation found; procedural errors with a material impact on the fairness of the investigation; and conclusions of the Part E Review Panel are not supported by the findings, or the findings are not supported by the evidence.
[8] SBAP was given a more limited authority to "reverse specific findings of fact not supported by the evidence," rather than a more general authority to "modify the factual findings."

on the University website.  The grievance procedures that applied to complaints of discrimination or harassment against students were adequately explained and available, and the grievance procedures applied to all University related programs and activities.

From academic years 2010-2011 through 2012-2013, the procedural rights contained in the *Conduct Review System* applied explicitly to the respondent, with a generalized statement that "complainants [would] be treated with the same general procedural fairness afforded" respondents.  Procedural rights for complainants were contained in the University's *Policy on Sexual Assault*, but they did not include the right to present witnesses and relevant evidence.  From academic years 2013-2014 through 2015-2016, the procedural rights for complainants and respondents applied equally to both parties.

In the first two academic years under review (2010-2011 through 2011-2012), there were no timeframes for major stages of the complaint process, including timeframes for completing the investigation and the appeal.  Starting in academic year 2012-2013, investigations were to be completed in 60 days (excluding any appeal).  No timeframe was specified for completing the appeal until March 2015, when a 45-day period was added.

From academic years 2010-2011 through 2011-2012, respondents received a written decision outlining the results of the investigation including the factual basis for the decision, while complainants were notified of the "outcome of the review," which may or may not have included the same information provided to respondents.  Starting in academic year 2012-2013, both parties received written notice of the investigation outcome, including a summary of the findings, the legal standard applied and the reasoning supporting the decision.

For the first four academic years under review (2010-2011 through 2013-2014), the University did not include a written assurance that the University would take steps to prevent recurrence of harassment and to correct its discriminatory effects in any Title IX policy applicable to students.  This assurance was added for the first time in March 2015.

In summary, OCR found that the University's post-March 2015 student Title IX Policies/Procedures met the requirements of Title IX.  The policies prior to this date, however, were not in compliance because they did not provide an equal opportunity to complainants and respondents to present witnesses and relevant evidence (2010-2013), did not provide reasonably prompt timeframes for major stages of the grievance process (2010-March 2015), did not provide equitable notice of the outcome to both parties (2010-2012), did not provide an assessment of conduct that may create a hostile environment on campus, which may have occurred off campus (2010-2012), and did not provide an assurance that the University will take steps to prevent recurrence of the harassment and to correct its discriminatory effects on the complainant and others as appropriate (2010-March 2015).  OCR recognizes that throughout this time period, the University was regularly reviewing and revising its policies and procedures to bring them closer to compliance.

2.   Complaints of sexual misconduct against faculty, staff, and third parties

Findings of Fact

For academic years 2010-2011 through 2015-2016, OCR reviewed the following three documents applicable to sexual misconduct by faculty, staff, and third parties: OED's complaint procedures (*OED Procedure*), the *Faculty Handbook*, and the *"Discrimination, Harassment, Sexual Harassment and Sexual Assault" Policy* (*Harassment Policy*), dated December 1, 2011.  The *Harassment Policy* applies to faculty and staff.  It listed

and defined prohibited behavior, including sexual harassment, sexual assault, and retaliation, and referred complaints to OED and provided OED's phone number, e-mail address, and web address.

OED investigated all complaints of sexual harassment and sexual violence filed against faculty, staff, and third parties, following the *OED Procedure*. From academic years 2010-2011 through 2015-2016, the *OED Procedure* was not revised, with the exception of the appeal process, which was revised during the 2014-2015 academic year (discussed below). After receiving a report, OED conducted an initial interview of the complainant, and the respondent was notified of the allegations and given an opportunity to respond. The investigation included reviewing relevant documents and evidence and interviewing relevant witnesses. Both parties had the right to provide relevant documents and witnesses and to receive a letter with a brief summary of facts and findings. The University endeavored to complete investigations within 45 days of an intake interview (absent extenuating circumstances).

At the conclusion of the investigation, OED determined whether a policy had been violated using the preponderance of the evidence standard. Once a determination was made, OED issued to both parties a letter with a brief summary of facts and findings, reasons for the decision, and legal standards applied. Decisions regarding sanctions were then made by a University administrator, who issued a written sanctions ruling to both parties; no timeframe was specified for issuance.

With respect to appeals, the University told OCR that there are two types of appeals – an appeal of a policy violation determination made by OED and an appeal of sanctions made by an administrator. Prior to changes made to the *OED Procedure* during the 2014-2015 academic year, information about the appeal process in the *OED Procedure* was incomplete and confusing because: no timeframe was specified for responding to a faculty's appeal of sanctions (10 days was specified for responding to a staff's appeal); and no other information regarding the appeal process was provided, including the grounds for filing, how the appeal would be conducted, or the timeline for completion.

During the 2014-2015 academic year, the University made changes to OED's appeal process, which clarified that either party could appeal the determination as to whether a policy violation had occurred or a sanction decision within 10 business days to the OED director (or to an administrator if the complaint had been investigated by the OED director). Upon receipt, the other party would be notified in writing within two business days and given 10 business days to respond. The OED director (or the administrator) decided whether to uphold the initial decision, remand the case back to the investigator, or reverse specific findings of fact not supported by the evidence. Both parties were notified of the decision to uphold or overturn the sanction within 15 business days. However, no timeframe was specified for completing the appeal regarding a policy violation.

From academic years 2010-2016, for faculty, there were four *Faculty Handbooks*, published in 2010, 2012, 2014, and 2015. All versions stated that complaints against faculty would be conducted by OED in accordance with *OED Procedure*. Significant provisions from the *Faculty Handbooks* were as follows: The 2014 and 2015 *Faculty Handbooks* specified a 60-day timeframe for completing investigations (extensions allowed), which conflicted with the 45-day specified in the *OED Procedure;* the 2014 and 2015 *Faculty Handbooks* articulated the principle of "fundamental fairness," requiring procedures for disciplinary action to be fair and impartial to both parties; the 2015 *Faculty Handbook* separated the role of fact finding from the role of making a violation determination; an OED investigator made findings of fact and the OED director (or another individual designated by an administrator, if the OED director had conducted the investigation) determined whether a policy violation had occurred. This provision in the 2015 *Faculty Handbook* conflicted with the *OED Procedure,* which did not require separation of roles; and the 2015

Case 2:20-cv-09539-DSF-RAO   Document 41-3   Filed 05/02/22   Page 12 of 32   Page ID
#:3055
Page 11 of 31: 09-13-2294 and 09-16-2128

*Faculty Handbook* contained appeal procedures, with specific timeframes, for faculty members to appeal the violation and sanction decisions and required both parties be notified of the outcome.

Analysis and Conclusions of Law

For the six academic years under review (2010-2016), the information provided to faculty and staff about how to file a complaint was adequately distributed and understandable, including in the *Faculty Handbook* and the *Harassment Policy,* and on the OED website. OCR found that for faculty, the 2010 and 2012 *Faculty Handbooks* did not address whether the policies included an assessment of whether off campus conduct may have created a hostile environment on campus. The 2014 and 2015 *Faculty Handbooks* extended the policies to include conduct where the individual harassed is affiliated with the University, which OCR found in practice was interpreted to include such assessment.  There was no comparable statement in staff policies.

For the six academic years under review, the *OED Procedure* required an initial intake meeting with the complainant, notification of the allegation to the respondent, review of relevant documents, and interviews of relevant witnesses.  It provided both parties with equivalent rights to provide relevant documents and witnesses.  With respect to faculty, the 2014 and 2015 *Faculty Handbooks* contained a "fundamental fairness" provision, requiring a prompt, fair, and impartial investigation and resolution; the 2015 *Faculty Handbook* required that both parties receive notice of the outcome.

For the six academic years under review, the *OED Procedure* specified a 45-day timeframe for completing investigations, but no timeframe was specified for determining the sanction or making a decision with respect to any appeal of the determination.  For faculty, the 2014 and 2015 *Faculty Handbooks* provided a 60-day timeframe for completing investigations, which conflicted with the 45 days specified in the *OED Procedure*.  The 2015 *Faculty Handbook* provided timeframes for the appeal process.

For the first four academic years under review (2010-2011 through 2013-2014), the *OED Procedure* required both parties to be informed of the outcome of the investigation and any disciplinary decision, but there was no requirement that both parties would be notified of the outcome of any appeal.  During the 2014-2015 academic year, *OED Procedure* was revised to require both parties to be notified of the outcome of the appeal.

For the 2010-2015 academic years, the policies and procedures for reports against staff and faculty did not provide an assurance that the University would take steps to stop the prohibited conduct, prevent recurrence, and remedy the discriminatory effects of any harassment.  For the 2015-2016 academic year, the 2015 *Faculty Handbook* contained this assurance; there was no similar statement in staff policies.

In summary, OCR found that with respect to policies applicable to sexual harassment and sexual violence by faculty, the University was in compliance for the 2015-2016 academic year, but out of compliance in prior years under review because the policies did not designate reasonably prompt timeframes for determining sanctions or completing the appeal process (2010 until the 2015 *Faculty Handbook*), did not provide for notice to the parties of the outcome of the appeal (2010-2014), did not address whether they provided an assessment of conduct that may create a hostile environment on campus, which may have occurred off campus (2010-2014), and did not provide an assurance that the University would take steps to prevent recurrence of the harassment and correct its discriminatory effects (2010-2015).

With respect to policies applicable to sexual harassment and sexual violence by staff, the University was out of compliance for all six academic years under review (2010-2016) because the policies did not provide for

reasonably prompt timeframes for determining sanctions or completing the appeal process (2010-2016), did not address whether the University provided an assessment of conduct that may create a hostile environment on campus, which may have occurred off campus (2010-2016), did not provide for notice to the parties of the outcome of the appeal (2010-2014), and did not contain an assurance that the University will take steps to prevent recurrence of the harassment and to correct its discriminatory effects (2010-2016).

   D.  **Whether the University provided a prompt and equitable response to incidents of sexual harassment and sexual violence of which it had notice, including incidents reported by five individuals – C1, C2, C3, C4, and C5 – pursuant to 34 C.F.R. §§ 106.31 and 106.8;**

   E.  **Whether the University's failure to provide a prompt and equitable response to oral reports and written complaints of sexual harassment and sexual violence allowed affected students to be subjected to or to continue to be subjected to a sexually hostile environment in violation of 34 C.F.R. §§ 106.31 and 106.8.**

**University Response to C1's Complaint**

OCR investigated C1's allegations that the University failed to provide her with: adequate interim measures; an equitable opportunity to have an advisor and to present and review evidence; an impartial and reliable review; and a prompt response.

<u>Findings of Fact</u>

C1, a female student, XXX XXXXXXX XX X XXXXX XX XXXXXXX XXX XXXXXX XXXXXXXXXXXXX XXXXX XXXXX XXXX XXXXX when she filed a complaint with DPS on November X, 2012.  The complaint alleged that approximately two years earlier, on XXXXXXXX X, 2010, she was raped by a male student, R1, who she had been dating at the time.  Prior to her DPS report, C1 did not disclose this information to an employee with a duty to report such information to the University or otherwise positioned to assist with any interim measures.  DPS identified C1 XX X XXXXXX XXXXXXXXXX XXXXXXX XX XXX XXXXXX.  DPS forwarded the report to the Los Angeles Police Department (LAPD), as required by its Memorandum of Understanding with LAPD, and to Student Affairs.  Student Affairs forwarded the report to SJACS and CWM.  Both students received notice of the SJACS investigation by letter dated November X, 2012.  The letter to C1 requested that she contact SJACS to discuss the allegations and the adjudicatory process, and included the University's sexual assault policy.  On November XX, 2012, R1 requested and received a copy of the complaint.  C1 did not respond to the November X, 2012 e-mail, and the SJACS investigators (Investigators) sent her a second request that she contact them on November XX, 2012.[9]  C1 responded on November XX, 2012, that she had not been using her University e-mail and would follow up with them.

C1 provided documents and other evidence to the Investigators via e-mail on December XC, 2012, and spoke with them by telephone on December X, 2012.  C1 asserted that the evidence included several admissions by R1 that he had raped her.  After the call, C1 provided a list of witnesses and additional evidence.  R1 met with Investigators and responded to C1's allegations on December XX, 2012 (day 45 of the investigation).  He asserted that the sexual contact was consensual.

---

[9] At this time, SJACS typically assigned a primary investigator who was assisted by a second investigator, and most of the interviews and other communications involved two investigators.  Other SJACS investigative staff were also involved in the process as needed, so OCR typically refers to Investigators in plural in this letter.

Winter recess for the University began December XX, 2012, and classes resumed on January XX, 2013. Beginning in January 2013 through the end of the investigation, Investigators provided regular updates to both C1 and R1. In addition, C1 provided significant additional evidence and, in turn, Investigators shared the evidence with R1. The Investigators' communications with the parties included general status updates, and the review of witness statements and other information gathered from each party.

On January X, 2013, C1 expressed to an Investigator her anxiety about XXXXXXXXX XX XXXXXX XXX XXX XXXXXX XXXX and that she wanted R1 to be removed from campus during the pendency of the investigation; the Investigator offered to provide her with an avoidance of contact letter on January X, 2013. On January XX, 2013, the Investigator informed C1 of resources available to assist her, including the CWM, Student Support and Advocacy, and a contact person who could help her register for classes. On January XX, 2013, C1 informed the Title IX Coordinator that she had not communicated with R1 since fall XXXX. The avoidance of contact letter was dated January XX, 2013, XXX XXXXX XXX XX XXXXXXX XXX XXX XXXXXX XXXX XXXXXXXX, but was not received by R1 until January XX, 2013. R1 did not contact C1 during the two days of delay.

In the course of the investigation, C1 provided the names of 14 individuals who she asked to be interviewed, and R1 provided the name of one witness. Investigators interviewed or communicated by e-mail with seven of those witnesses, including the one witness provided by R1. Six of the witnesses did not respond to Investigators' e-mails or voicemails. Investigators did not interview two of C1's witnesses but received written declarations from them.

On February X, 2013, the Investigators met with C1 and requested that she provide any additional information that she had. C1 requested additional time to provide witness information and additional statements. The Investigators noted to C1 that they would delay a decision until they received and reviewed the information she wished to submit. C1 submitted the information on February XX, 2013, and asked again that Investigators delay a decision while she gathered additional evidence for their review.

On March X, 2013, C1 provided to Investigators an additional binder of information to support her allegations, including the names of three more witnesses, and stated that she had more information to provide to Investigators. The Investigators asked her to submit the rest of the information as soon as possible for their review.

The University was on spring recess from March XX-XX, 2013. In a March XX, 2013 meeting with C1, Investigators' notes state that they told her "the majority of our students are good students who may have made poor choices." C1 relayed that she had additional witnesses, and she would ask them to contact the Investigators. The Investigators again explained to C1 that the decision would be delayed pending contact with the additional witnesses.

On April X, 2013, they met again, and C1 brought a University student to serve as her advisor. Investigators did not allow the other student to attend the meeting because they were concerned it would be a breach of R1's privacy to have a peer advise C1. According to Investigators' notes, C1 said she understood and declined their offer to postpone the meeting or attempt to contact a different advisor; the meeting proceeded. C1 delivered to Investigators a letter in which, among other things, she alleged that they were biased against her and in favor of R1. Investigators responded that C1 had misunderstood their statement on March XX, 2013, and reiterated that SJACS approached the investigation as a neutral third party. C1 provided more documents to support her allegation of rape, and then provided additional evidence to Investigators the next day, on April X, 2013.

On April XX, 2013, C1 submitted more evidence to Investigators.  On April XX, 2013, C1 sent an e-mail to Investigators requesting a prompt resolution of her complaint.  Investigators responded the next day, and outlined her requests in the preceding months that they delay their decision while she gathered more evidence, and that they had shared with her at those times the impact that the late submissions of additional evidence would have on the timeline for completing the investigation.

Investigators notified C1 and R1 that the deadline to submit any last information was May X, 2013, and C1 provided additional documents to Investigators on the same date.  On May X and May X, 2013, Investigators interviewed two more witnesses who C1 had asked them to interview.  On May X, 2013, SJACS e-mailed its decision to C1 and R1, 184 days after beginning the investigation.  Based on the preponderance of the evidence, SJACS concluded that R1 reasonably believed that C1 had given her consent XX XXXXXX XXXXXXXXXXX XX XXX XXXXXXXX XXXX XXXXXXXX, and that there was insufficient evidence to show a violation of the *Student Conduct Code* by R1.  The Investigators reviewed and considered all of the evidence provided by C1 and R1, including evidence which C1 asserted showed that R1 had admitted in the past to raping her.  However, Investigators found that, based on an analysis of all witness interviews and other evidence gathered, R1 had not admitted to rape.

C1 filed a detailed appeal on May XX, 2013.  R1 was informed of the appeal on May XX, 2013.  He requested and received an extension and filed a response on June XX, 2013.  The SBAP considered the appeal on July XX, 2013, and its written decision was mailed to the parties on July XX, 2013, 80 days after the investigation was completed.  The written decision showed that SBAP reviewed the evidence in the case and addressed each of the concerns raised in C1's appeal.  The letter cited specific facts to support its decision to uphold SJACS' finding.  The decision also contained a section discussing SJACS procedures; specifically, it found that C1 and R1 had access to information submitted by the other; both C1 and R1 had equal rights to secure advisors; Investigators were not biased; Investigators made diligent efforts to contact C1's witnesses; and the length of the investigation was not unreasonable.

Analysis and Conclusions of Law

With respect to C1's allegation that she was not provided with adequate interim measures during the University's investigation, OCR's investigation showed that C1 did not notify any University employee with a duty to report such information or otherwise positioned to assist with any interim measures before the November X, 2012 sexual assault report, and at the time she made her report, XXX XXX XXXXXXX XX XXXXX XXXX XXX XXXXXXXXXX.  XXXX XX XXXXXXXX XX XXX XXXXXXXXXX XXX XXXXXX XXXXXXXX, the University put in place an avoidance of contact letter between C1 and R1 within two days of the beginning of the spring 2013 semester.  In addition, an Investigator put C1 in contact with Student Support and Advocacy and her academic department to assist her with scheduling and other concerns.  Based on the information that C1 was providing to the University, the University did not have sufficient information that would put it on notice that additional measures were needed so that she could continue to access to the University's programs.  As such, OCR found insufficient evidence that the University failed to provide appropriate interim measures to C1.

OCR investigated whether or not the investigation was equitable for both C1 and R1.  Throughout the investigation, Investigators frequently communicated with both parties.  The investigative files demonstrate that Investigators reviewed all of the information provided by C1 and R1, and that both parties reviewed and responded to the information provided by the other and by witnesses.  With respect to allowing C1 to bring a University student as her advisor to the April X, 2013 meeting, the University stated a concern about protecting R1's right to confidentiality during the investigation.  Further, OCR did not find any evidence that the University allowed R1, or any other complainant or respondent, to bring a student as an advisor in this

or other cases it reviewed.  OCR also found it significant that the University gave C1 the opportunity to reschedule or to call another trusted individual as an advisor, but C1 declined, opting instead to proceed with the meeting.  Based on the foregoing, OCR concluded that the University's investigation was equitable. C1 also alleged that the University was biased in favor of R1, and that this was demonstrated by the Investigators' statement that University students were generally good people.  OCR's investigation found that this statement was made in the context of Investigators explaining that SJACS was a neutral party, and not specifically about R1.   In addition, OCR reviewed the contents of the Investigators' written communication with C1 and R1.  OCR did not find evidence of bias in the SJACS investigation.

OCR's investigation also examined whether or not the University's investigation was prompt.  When analyzing whether a complaint was resolved in a reasonably prompt timeframe, OCR completes a case-by-case, fact-specific analysis, which takes into account the complexity of the investigation, the severity of the allegations and other mitigating factors, such as intervening school breaks and short breaks for concurrent law enforcement activity and requests by the parties for extensions.

In this matter, the SJACS investigation was completed in 184 calendar days.  OCR identified several mitigating factors for the length of the investigation.  In this regard, there was an almost two year lag in time between the sexual contact at issue and when it was reported, which made it more difficult investigate.   In addition, the investigation involved requests to interview 15 witnesses (Investigators interviewed seven, received written declarations from two, and did not receive responses from the remaining six) and a large volume of documentation and other evidence.  During the investigation, there were approximately 28 calendar days of intervening school holidays and breaks, which impacted the availability of the parties and witnesses.  Furthermore, C1 submitted additional and extensive information throughout the investigation, and also requested that the Investigators wait to complete the investigation until she could provide more evidence and attempt to contact her witnesses who were unresponsive to Investigators.  Investigators granted her request on each occasion while explaining to C1 that allowing her additional time would extend the length of the investigation.  In addition to the time needed to review C1's documents, Investigators also had to provide an opportunity for R1 to review the new information as a matter of equity.  The Investigators informed the parties that no additional information would be accepted after May X, 2013.  The decision was issued approximately one week later.

Furthermore, the appeal process added more than two months to the process.  The length of time to complete the appeal was due, in part, to the detailed appeal document filed by C1, and to the extension of time requested by R1 to review C1's appeal and file his response.  OCR found that both the investigation and appeal processes were prompt because the delays were due to the extensive documentation submitted by C1, requests for extensions, intervening school breaks, and repeated attempts to engage unwilling witnesses.  Accordingly, OCR concluded that the University provided a prompt and equitable response to C1's complaint.  OCR also notes that SJACS routinely provided updates and responsive information to C1 and R1 throughout.

**University Response to C2's Complaint**

C2's allegations included that the University failed to provide her with: adequate interim measures; an equitable opportunity to present and review evidence; a fair appeal process; and a prompt response.

<u>Findings of Fact</u>

On March XX, 2013, a female student, C2, reported to DPS that she had been sexually assaulted by a male student, R2, XX XXXX XXXXXXXX 2012.  She alleged that she did not want to have sex with R2, but he

pressured her into agreeing, and when she verbalized her demand that he stop, R2 continued to do so for a time before stopping.  C2 also reported that she felt threatened by R2 because XX XXXXXXX XXXXXXX XXXXX XXX XXXXX XXXX XXX XX XXXX XXX XXXXXX XX XXXX XXXXX.

By letter dated March XX, 2013, R2 was notified of the SJACS investigation and was asked to schedule an appointment with the Investigators.  In a separate letter of the same date, an avoidance of contact letter was issued between C2 and R2.  C2 and R2 had at least one class together in the spring 2013 term.  To address concerns raised by C2, the University took several initial and later steps in addition to the avoidance of contact.  The Student Support and Advocacy Office offered to change C2's schedule, but she declined.  The Student Support and Advocacy Office contacted three of C2's professors at her request for attendance leniency.

R2 met with Investigators and provided his response to the allegations on April XX, 2013.  He asserted that the sexual contact was consensual, but that when C2 changed her mind during the sexual intercourse, he immediately stopped.

C2 met with Investigators on April XX, 2013; she declined to discuss her factual allegations at length because she had already described her allegations to DPS.  After the meeting, C2 provided documents to Investigators, including XXXX XX X XXXX XXXXXX XX XX XXXX XXX XXXXX XXXXXXXXXXX.  Investigators held a second meeting with C2 on May X, 2013.  C2 asked the Investigator to XXXXXX XXXX XXXX and to ensure that she would not have any classes with R2 in the next school year.  C2 e-mailed SJACS on May XX, 2013, and SJACS updated C2 on May XX and May XX, 2013.

Investigators interviewed the witnesses named by C2 and R2.  One witness, X XXXXXX XXXXXX XX XXXX (Friend A), described what C2 and R2 had each told her about what had happened on the date at issue after XXXXXXXXX XXXX XXXXXX XXXXX XX XXXXXXX XXXX.  Friend A recalled that both C2 and R2 characterized the incident as consensual, but that C2 had subsequently determined it was a poor decision.  In addition, Investigators viewed a social media post from C2 to R2 dated XXXXXXXX XX, 2012, which referenced the incident.  C2 wrote that she engaged in the act because she "felt bad" for R2.

On April XX, 2013, R2 e-mailed an Investigator regarding a verbal argument he had with C2 during XXX XXXXX XXXXX in which they both were enrolled.  This class was a semester-long XXXXXXX XXXXX XXXXXXXX XXX XXXX XXXXXXXX XX XXXXXXXXX XXX XXXXX XXX XX XXXXXXXXXX XXXXXXX XXXXXX XXX XXXX XXXXXXXX.  The Investigator advised R2 to avoid further confrontations or interactions with C2.  Meanwhile, Student Support and Advocacy, Investigators, and the students' academic advisor reviewed the fall 2013 schedules to determine whether C2's and R2's schedules would overlap and attempted to mitigate their future interactions.

With respect XX XXX XXXX, on May XX, 2013 and May XX, 2013 respectively, Investigators interviewed a faculty member who was teaching C2 and R2's shared class and a faculty member familiar with XXXX XXXXX.  Both stated that XXX XXXXX were not aimed at anyone or intended to threaten anyone.  On May XX, 2013, R2 was also interviewed.  Investigators received a copy of XXX XXXX XXXXXXXXX X XXXX on May XX, 2013 XXX XXXXXX XX.

By letter dated June X, 2013, SJACS notified C2 and R2 of the results of its investigation, which found by a preponderance of the evidence that there was insufficient evidence to support a finding that R2 violated University policies.  With respect to the first allegation, Investigators concluded that the sexual intercourse was consensual, and that when C2 withdrew her consent, R2 ceased the conduct.  Investigators found that the social media message sent to R2 by C2 on XXXXXXXX XX, 2012 indicated that the sexual intercourse was

consensual.  In addition, it concluded that how C2 had characterized the incident to Friend A shortly after
the incident was more consistent with R2's description than C2's later description of the incident as
nonconsensual.  On the second allegation, among other things, Investigators reasoned that XXX XXXXXXXX
XXXX in question was not directed personally at C2 nor was it intended as a direct threat to C2.[10]  SJACS
continued the avoidance of contact letter.

On June XX, 2013, Investigators received C2's appeal of the decision.  In her appeal, she asked to be
informed of and given the opportunity to reject SBAP panel members.  R2's response was received on July
X, 2013.  Neither C2 nor R2 were informed of the SBAP panel members' identities, and they were not given
an opportunity to reject certain SBAP panel members.  The University's procedures at the time and through
the 2015-2016 academic year did not include safeguards to ensure that the appeal panel members did not
have a relationship that could create a conflict or potential bias regarding any of the involved students.  By
letters dated August X and X, 2013, the University provided written notification to C2 and R2 of the SBAP
decision.  The panel upheld all of the SJACS findings, and provided an explanation for its decision.  In
addition, the panel responded to C2's assertion that she was entitled to strike members of the SBAP; the
SBAP stated that the appeal process was equitable in that neither party had a right to strike members of
the appeal panel.

<u>Analysis and Conclusions of Law</u>

C2 alleged that the University did not provide appropriate interim measures during the pendency of the
investigation.  OCR's investigation showed that after receiving notice of the alleged sexual assault and upon
receiving further information during the investigation regarding the parties' needs, the University issued an
avoidance of contact letter, contacted C2's professors to request leniency in her attendance, offered to
change her class schedule, and reviewed the schedule for C2 and R2 for fall 2013 in order to minimize their
future contact.  While the avoidance of contact letter was effective in keeping them apart outside of their
shared classes, the students saw each other in a class XXXX XXX XXXX X XXXXX XXXXXX XX XXXXXXXX.  On
April XX, 2013, R2 reported an incident in which they verbally argued in class despite the avoidance of
contact letter.  After this incident, the Title IX Office promptly counseled R2 not to speak with C2 and began
to assess what actions could be taken to change their schedules in the following semester.  Based on the
information that the University received at the time, OCR found that the University was in compliance
because it timely followed up on the reports from the parties, assessed what if any interim measures were
needed, considered the rights of both parties in implementing such measures, and implemented measures
that were appropriate in preventing further harassment, given that there were no other alternative classes
during that semester that would keep the students on track to meet the graduation requirements.

With respect to C2's allegation that she did not have equitable access to present and review evidence, Title
IX requires, at minimum, that the parties have timely and equal access to the evidence and information.
Here, when C2 and R2 made a request for documents, they received them.  There was no evidence that
they were not provided an equal opportunity to participate in the investigation, including in the review of
documents.  Therefore, OCR concluded that both parties were afforded equal opportunities to participate
in the investigation.

---

[10] OCR interprets its regulations consistent with the requirements of the First Amendment, and all actions taken by
OCR must comport with First Amendment principles.  No OCR regulation should be interpreted to impinge upon rights
protected under the First Amendment of the U.S. Constitution or to require recipients to enact or enforce codes that
punish the exercise of such rights.

OCR also investigated C2's allegation that she should have been allowed to remove members from the SBAP panel if she believed they were biased.  While the University is not required pursuant to Title IX to offer an appeal to students, an appeal process itself, when offered to both students, must be equitable. When C2's appeal was filed, University students and employees served on the SBAP appeal board.[11] Neither party knew the identities of the appeal members adjudicating their appeal; consequently, neither party had an opportunity to evaluate whether appeal members knew them personally and/or were biased against them.[12]  OCR reviewed the documents related to the appeal and did not identify any information that would suggest bias in the decision-making process.  However, OCR has concerns that the University has not created a mechanism for ensuring that panel members do not have a conflict of interest.

The University completed its investigation 65 days after receiving the complaint.  The appeal panel notified C2 and R2 of its decision on August X, 2013, 48 days after the investigation decision.  OCR found that the University's investigation and appeal were prompt.

In sum, OCR found that the University provided a prompt and equitable process.   However, OCR's investigation raised a concern that the University does not have sufficient safeguards to ensure that appeal panel members are free from conflicts of interest.  Prior to concluding its investigation of these issues, the University expressed an interest in voluntary resolution under section 302 of its Case Processing Manual, and OCR agreed it was appropriate to do so.

**University Response to C3's Complaint**

C3's specific allegations included that: her resident advisor did not respond appropriately when she notified him that she had been sexually assaulted, and the University failed to provide her with adequate interim measures and sufficient notice of the reasons for its determination.

Findings of Fact

On approximately XXXXXXX XX, 2012, a female student, C3, told her resident advisor that she had sexual contact with a male student, R3 (XXXXXXX XX incident).  She did not provide specific details nor did she allege that it was nonconsensual.  On XXXXXXX XX, 2012, C3 went to the resident advisor's room and expressed sadness.  The resident advisor understood this to be a reference to C3's relationship to R3, and recommended she contact the counseling center.  C3 borrowed his phone and called the counseling center. C3 and the resident advisor agreed to walk together to the counseling appointment the next day, XXXXXXX XX, 2012.  On the walk, C3 told the resident advisor XXXX XXX XXX XXXXX XXX XXXX XX XXXXX XXXX XXX XXXXXX XXX XXXX XXXX XX XXX XXXXXXXX XXXXXXXXX XXX.  She did not say that the interaction was nonconsensual.

The next day, the resident advisor told his supervisor about his conversations with C3 and that he was not sure whether it was a sexual assault.  His supervisor advised him that since he had taken C3 to the counseling center, there was not a need to take further steps.  On XXXXXXX XX, 2012, the resident advisor filed an incident report regarding his interactions with C3 between XXXXXXX XX-XX, 2012.

C3 contacted DPS on XXXXXXX XX, 2012 and reported that: (1) XX XXXXX XXXXXXXXX, 2012, R3 had forcibly hugged and grabbed her; (2) XX XXX XXXXXXXXX, 2012, he forcibly kissed her and picked her up without her

---

[11] As of spring 2014, students do not serve on the appeal panel for sexual harassment/sexual violence cases.
[12] This continued to be the case through the 2015-2016 academic year, the last year reviewed by OCR in this investigation.

consent, and after she told him to leave, he said she could not get far away from him XXXXXXX XXXX XXXXX XXXXX XX XXXX XXXXX; (3) XX XXXXX XXXXXXX, 2012, R3 kissed her with such force that he bruised her lip; and (4) on XXXXXXX XX, 2012, he XXXXXX XXX XXXXXXXXX XXXXXXXXXX her despite her verbally telling him no.   DPS notified LAPD, CWM, and the Associate Director of Residential Coordinators.   The Associate Director of Residential Coordinators made arrangements for C3 to be housed XX X XXXXX XXXX XX XXXXXX at University expense, and C3 lived there for approximately one week.  The University allowed C3 to cancel her housing contract without penalty, and C3 moved off campus and thereafter commuted to campus.

On October XX, 2012, SJACS received the DPS report, initiated its investigation, and notified R3 by letter. On the same date, C3 and R3 were given a mutual avoidance of contact letter.  R3 met with Investigators on November X, 2012, and stated that the sexual contact was consensual.   On November XX, 2012, SJACS interviewed C3.   Investigators interviewed C3's roommate and a friend of R3 familiar with C3; both described C3 and R3's interactions as friendly and flirtatious.  The Investigators reviewed all of the evidence submitted by C3 and R3, including social media communications.  R3 shared with SJACS his text messages with C3.  In a text message following the XXXXXXX XX incident, C3 wrote that she did not feel well and had "made a mistake."

The University notified R3 and C3 of the investigation findings by substantially similar letters dated December X, 2012 (to R3) and December XX, 2012 (to C3).  Investigators concluded that the preponderance of the evidence was insufficient to support a finding that R3 violated University policy.  Both letters stated that Investigators found that C3 and R3 were in an informal consensual dating relationship.  Both letters provided the telephone number for the Director of SJACS office (Director), and both letters invited each of the parties to contact the Director with any questions.  The letter to C3 included information about the finding that the information gathered was inconsistent with information provided by C3 in the DPS report, and provided information about filing an appeal.  The internal SJACS report, which was not provided to the parties, provided a more detailed analysis, including the basis for finding that C3's reports were not credible.

On February X, 2013, C3 filed her appeal, after two extensions were granted.  On February XX, 2013, after she had submitted her appeal, C3 met with an Investigator who answered her questions about the SJACS decision.  On February XX, 2013, R3 filed a response to C3's appeal.  The SJACS decision was appealed under the PRAP process, which was completed on March X, 2013.  C3 and R3 were notified of the decision by letters dated March X, 2013.  The written decision stated that the panel determined there was no new evidence to alter the SJACS decision.  The panel stated that the avoidance of contact letter would remain in place, and encouraged the parties to access services at CWM.

Analysis and Conclusions of Law

OCR found no corroboration that C3 told the resident assistant that she had been sexually assaulted or sexually harassed.  OCR found that the resident assistant acted appropriately in accompanying her to the counseling center.  He also discussed the situation with his supervisor, completed a written incident report about his communications with C3, and participated in the SJACS investigative process as a witness.  Based on the information shared with the resident assistant, OCR did not find evidence that the resident assistant failed to promptly respond to notice of sexual assault.  Furthermore, OCR found that after C3 made her report to DPS, the University took steps, in addition to those taken by the resident assistant, to assess the information provided and determine what if any additional interim measures were appropriate.

Regarding C3's allegation that she was not provided with an explanation of the findings, OCR found that the letter to C3 notifying her of the investigation conclusion was short, but it was materially the same as that

which was provided to R3.  In addition, the letter provided to each of the parties invited them to meet with the Director if there were any questions.  After receiving a request for a meeting from C3, an Investigator met with her on February XX, 2013, and answered her questions about the decision.  Therefore, OCR concluded that the University provided adequate notice of its decision to C3 and R3.

With respect to the adequacy of interim measures, upon notice of C3's report of sexual assault, the University put in place an avoidance of contact letter and moved C3 to X XXXXXX XXXXX at University expense.  OCR notes that while the avoidance of contact letter was an appropriate interim response, the University may not have considered whether moving C3 out of the dorms unduly burdened her, or whether another interim measure that adequately respected the due process rights of both parties could have been implemented.  Since, in this case, C3 opted to move off campus and commute shortly after filing her complaint and did not tell the University that she wanted to stay on campus or return to her original housing, OCR concluded that the interim measures were adequate.  Accordingly, OCR determined that the University provided C3 with a prompt and equitable response.

**University Response to C4's Complaint**

C4 alleged to OCR that she did not receive adequate interim measures during the pendency of the investigation and appeal.[13]

<u>Findings of Fact</u>

On August XX, 2013, C4, a female XXXXXXX student XXXXXXX at the University, filed a complaint with the Title IX Office alleging that, on XXXXXXX XX, 2013, she was sexually assaulted by R4, a male XXXXXXX student XXXXXXX at the University, and other men (Person A and Person B) who were not University students at an off campus fraternity party; the fraternity was registered as a student organization with the University and required to follow the University's fraternity-related regulations.[14]

C4 told the Investigators in her initial report that since the sexual assault, she had reduced her presence XX XXX XXXXXXXX XXXXXX in order to avoid R4.  In addition, XXX XXXXX had referred her to counseling XXXXXXX XXX XXXXXXXXX XXXXXXX because he observed XXXX XXX XXXXXXXXXXX XXX XXXXXXXX.  C4 stated that she suspected XXXXX XXXXXXX XX XXX XXXXX XXXX XX XXX XX knew what had happened, because XXXXXXX she had never met came up to her and told her XXXX XXXX XXX X XXXXXXX XX XXX, and that this made her feel uncomfortable.  C4 continued to receive counseling XXXXXXX XXX XXXXXXXXX XXXXXXX after her report to SJACS.

Following the August XX, 2013 complaint filed by C4, on September X, 2013, the University issued an avoidance of contact letter to R4 notifying him to avoid interaction with C4 and provided notice of the same XX XXX XXXXXXXXX XXXXXX.  Throughout the complaint process, C4 was supported by CWM.

---

[13] In 2016, the California Court of Appeal overturned and vacated the University's decision against R4 in this matter for a variety of reasons, including because the court held that R4 was denied fair access to documents and interviews and not provided with adequate notice of the charges against him.  Accordingly, OCR did not reach a separate conclusion as to whether the investigation was equitable, and is administratively closing this allegation.  <u>See</u> OCR's Case Processing Manual, § 108(u).  Systemic issues are being addressed through other sections in this letter.

[14] OCR notes that, according to Part G, Section 2 of *Scampus*, registered fraternities are required to follow University regulations for certain events, and were required to do so for this event.  In this regard, for example, the risk manager for the fraternity reported that he was checking identification for students at the party to be in compliance with University regulations regarding such events.

In mid-October, 2013, the University notified Person A and Person B at their addresses that they would not be permitted on the University campus.  On October XX, 2013, C4 met with Investigators.  During this meeting, C4 described ways in which her access to University programs had been impacted.  She stated that she was getting X grades for the first time in her life, after making her report to the University.  She stated that she no longer slept well after she made her complaint, XXX XXXXX XXXXX XXXXXXXX XX XXXXX. Although this information was shared with the Investigator, OCR did not find evidence that this disclosure resulted in action by the Title IX Coordinator to consider, and as appropriate, mitigate these concerns with responsive interim measures for C4.

On February X, 2014, C4 filed her response to R4's appeal.  Again here, she told the University how her access to University programs had been impacted.   She stated that before the incident, XXX XXXXX XXXXXXXXXX XXXX XX XXX XXXXXXXX XXXXXXX XXXXXXXXX XXXX XXXXX XX XXXXXXXX XXXXXXXX XXX XXXXXXXXX.  Since the incident, XXX XXXXXXX XXX XXXXXXX XXXXXX XX XXXX XX XXXXXXXX.  She described that she struggled academically, isolated herself from her friends, became fearful XX XXX XXXXXXX XX XXX XXXXXXXX XXXX XXXX XX XXX XX, no longer attended University XXXXX XXXX XXX XXXXXXX XXX XXXXXXXXX, and considered transferring to a different university.  She experienced anxiety when attending XXXXXXXX XXX XXXXXXX XXXXXXXX with respect to whether or not R4 was present.  She XXXXXX XXXXXXXXX during the appeal because working on her appeal statement was upsetting to her.

<u>Analysis and Conclusion of Law</u>

During the pendency of an investigation, as the University was receiving new information about C4's evolving needs, the University needed to assess what if any reasonable interim measures were necessary and effective.   Interim measures should be individualized and appropriate based on the information gathered by the Title IX Coordinator, making efforts to avoid depriving any student of her or his education.  C4 alleged that although the University put an avoidance of contact letter in place in September 2013, it was difficult to avoid R4 after the incident XXXXXXX XXXX XXXX XXXX XX XXX XXXXXXXXX XXXXXXX.   On August XX, 2013, C4 told Investigators that she had XXXXXXX XXX XXXXXXXX XX XXX XXXXXXXXX XXXXXX and that XXXXXXX XX XXXX XXXX XXXX XXX XXX XXX XXXX had approached her after the incident to say XXXX XXX XXXXXXXXX XX XXX, which led her to believe the incidents had been discussed XX XXX XXXX and caused her to feel uncomfortable and, later, fearful.  She also reported on October XX, 2013, that her grades had slipped and she was suffering from sleeping problems.

On February X, 2014, she provided additional specific information to the University about the limitation on XXX XXXXXX XX XXX XXXXXXXX XXXXXXX XXXXX XXX XXX XXXXXXXXXX XXXXX XXXX XXXXXXXXXX XXXXXXXXX; she identified that she was struggling academically, was no longer attending University XXXXX XXXX XXXXXXX XXX XXXXXXXXX, and had considered transferring to a different university.  She also missed XXXXXXXX XXXXXXXXX during the appeal because working on her appeal statement was upsetting to her.  C4 received counseling XXXXXXX XXX XXXXXXXXX XXXXXXX and was supported by CWM during the investigation, which C4 told OCR were important supports.

However, OCR identified a concern that the University may not have taken sufficient steps to determine whether additional interim measures, if any, were necessary to ensure equitable access to XXX XXXXXXXXX XXXXXX for C4, even after C4 identified the impact on her ability XX XXX XXX XXXXXX.  In addition, after she reported to an Investigator in October that her grades were slipping and that she was having difficulty sleeping, again, OCR did not receive any evidence that the Title IX Coordinator assessed whether other reasonable interim measures, including academic accommodations, may have been responsive to such notice.  After she provided additional information in February, again, there is no documentation that the University assessed what new or different reasonable interim measures, if any, might be needed and

reasonably effective.  Prior to OCR completing its investigation of this issue, the University expressed an interest in voluntary resolution, and OCR agreed it was appropriate to do so.

**University Response to C5's Complaint**

C5 and R5 are XXXXXXXX XXXXXXXX XX XXX XXXX XXXXXX.  C5's OCR complaint involves three Title IX investigations related to a sexual interaction between C5 and R5, which occurred on XXXXX XX, 2015.  The first complaint was filed by R5 against C5 (Investigation #1) and, the two subsequent complaints were filed by C5 against R5 (Investigations #2 and #3).

C5 alleged in his complaint to OCR that the University failed to provide him with a prompt and equitable response to these three investigations, thereby subjecting him to a continued hostile environment. Specifically, OCR investigated C5's allegation that the University failed to provide him with a prompt and equitable process because he is male, that the University found that he was less credible than the involved female student (R5), and that the University failed to apply the definition of consent in the University's policies that were applicable at the time when it found that he had consented to sexual contact with R5.

Findings of Fact

On May XX, 2015, Investigation #1 was initiated by a complaint filed by R5 against C5.  R5 told the Investigator that she and C5 had engaged in consensual sexual contact on XXXXX XX, 2015 (XXXXX XXXX sexual interaction), and she subsequently told C5, on XXXXX XX, 2015, that she did not want to have sexual relations with him again.  According to R5, C5 was upset by this and thereafter engaged in harassing, sexually harassing, and stalking behavior toward her.  Specifically, R5 alleged that: (1) C5 threatened to contact her ex-boyfriend; (2) C5 contacted the ex-boyfriend via social media, and the ex-boyfriend blocked C5's account; (3) C5 then created a fake social media account under a pseudonym and contacted the ex-boyfriend about R5 again; (4) C5 followed her to the office of a professor on XXXXX X, 2015, where R5 was discussing the possibility of filing a complaint against C5 with the professor and knocked seeking entry to the office; and (5) C5 texted R5 ten minutes later asking to talk with her.  R5 provided evidence in the form of e-mail correspondence, text messages, and social media postings in support of allegations 1, 2, 3, and 5.

An avoidance of contact letter was issued to the students on May XX, 2015.  On the same date, the SJACS investigator[15] (Investigator) notified C5 by e-mail that the Title IX Office had received a report alleging that he had violated the following sections of the *Student Conduct Code*:

- 11.51A, engaging in discriminatory or harassing behavior (defined under the University's policy as "harassing, abusive, or intimidating actions against anyone based on any protected characteristic . . . when the conduct is sufficiently severe, persistent, or pervasive such that it has the purpose or effect of unreasonably interfering with an individual's academic or work performance, or creating an intimidating, hostile or offensive academic, work or student living environment");
- 11.53A, engaging in sexual or gender-based harassment (defined, in relevant part, as "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when . . . such conduct is sufficiently severe, persistent, or pervasive that it has the purpose or effect of unreasonably interfering with an individual's work or academic performance, or creating an intimidating, hostile, or offensive working or learning environment or student living environment"); and

---

[15] The investigations involving C5 and R5 were conducted by one investigator.

- 11.53E, engaging in stalking (defined as "a non-consensual course of conduct directed at a specific person that would cause a reasonable person to fear for the person's safety or the safety of others, or suffer substantial emotional distress").

The notice e-mail requested that C5 contact the Title IX Office to schedule an appointment with the Investigator before June X, 2015.

On May XX, 2015, C5 met with the Investigator to review and respond to the allegations in Investigation #1. C5 was informed of the investigation process and his rights.  While reviewing R5's report, C5 stated, among other things, that R5 "physically assaulted" him on XXXXX XX, 2015 by grabbing his arm, and referred to the XXXXX XXXX sexual interaction as a "consensual sexual encounter."  He stated that on April X, 2015, C5 knocked on the professor's door when R5 was meeting with the professor because he overheard her voice and became concerned that she was accusing him of sexual harassment.  In addition, C5 told the Investigator that he routinely went to the professor's office at that time after class and was not following R5.  C5 did not deny the communications with R5's ex-boyfriend, but stated that his intention was to apologize to the ex-boyfriend for the sexual conduct he engaged in with R5.

On June X, 2015, C5 made a request to the Title IX Office for an investigation regarding sexual harassment of him by R5 (Investigation #2).  Specifically, C5 alleged that during the XXXXX XXXX sexual interaction: (1) R5 was emotionally aggressive and insulted XXX XXXX XX XXXXXXX; (2) R5 threatened that she could "knock him out" if she wanted to XXXXX XXXX XXXX XXXXXXXX XX XXX XXXXXXXX XXXXXXXX XXXXX XXXX XXX XXXXXXX XX XXXXXXXXXXX XXX; and (3) R5 demanded to give and receive oral sex, but he did not consent and they did not engage in oral sex.

On June XX, 2015, the Investigator notified R5 that the Title IX Office had received a report alleging that she had violated the following sections of the *Student Conduct Code*: 11.51A, engaging in discriminatory or harassing behavior; and 11.53A, engaging in sexual or gender-based harassment.  On June XX, 2015, C5 added to his allegations in Investigation #2, asserting that on XXXXX XX, 2015, R5 physically assaulted him by grabbing him by the arm during a discussion about their relationship.  The Investigator notified R5 of the additional allegation on June XX, 2015, which alleged a violation of the following additional sections of the *Student Conduct Code*: 11.53D, engaging in domestic violence, dating violence, or intimate partner violence (defined as "violence committed against a person who is a spouse or former spouse, a cohabitant or former cohabitant, a person with whom he or she has a child, or with whom he or she has, or had, a dating, romantic, intimate or engagement relationship, or violence by a person who is or has been in a romantic or intimate relationship with the victim"); and 11.53E, engaging in stalking.  The Investigator requested that R5 contact her to discuss the complaint by July X, 2015.

Investigation #1 and Investigation #2 were investigated simultaneously.  R5 provided names of witnesses who she said had knowledge of the events, including other students, her ex-boyfriend, and two professors, including the one who she was meeting with when C5 knocked on the door.  C5 did not proffer any witnesses or witness statements.  In addition to the interviews of the witnesses named by R5, the Investigator gathered text messages, e-mails, and social media messages from C5, R5, and other individuals.  Both C5 and R5 provided responses to the interviews and other information.  When interview notes or other new information was ready, the Investigator posted it on a secure database and notified the students that they could view the information.  In addition, in support of his allegations against R5 and his defense against her allegations, C5 provided detailed written narratives and analyses to the Investigator.

On July X, 2015, R5 met with the Investigator to discuss C5's allegations in Investigation #2.  Among other things, R5 stated that in the XXXXX XXXX sexual interaction, (1) she did not insult his sexual performance;

(2) she did not threaten to knock him out XXXXX XXXX XXXX XXXXXXXX XX XXX XXXXXXXX; (3) she and C5 did not XXXXXX XX XXX XXXXXXX XX have additional sexual contact XXXXX XXXXXXXX XX XXX XXXXXXXX; and (4) she did not request or offer oral sex.

On or about October X, 2015, C5 e-mailed to the Investigator another detailed narrative and analysis related to Investigations #1 and #2, which included a detailed description of the XXXXX XXXX sexual interaction, among other things.  C5 stated in the narrative that he told R5 after XXXX XXXX XX XXX XXXXXXXX that he withdrew consent for sexual activity by saying something like, "I do not feel comfortable."  However, he wrote, R5 kept XXXXXXXXX XXXX XXXX XXXXXXXX XXX XXXXX XXXXXXXXX XXX XXXXXXXXX XXX XXXXXXX XXX without consent.  C5 reported that he XXX XX XXX XXXXX XXXXXX "to avoid the embarrassment," and subsequently XXXXX XXX XXXX XX X XXXXXXXXX XXXXXX XXXXX XXX XXXXXX XXX XXX X XXXX.

With respect to Investigation #3, on October XX, 2015, approximately XXXXX XXXXXX after the XXXXX XXXX sexual interaction and five months after R5's initial report to the University, C5 stated in an e-mail to the Investigator that he had realized that the XXXXX XXXX sexual interaction was sexual assault by R5.  When asked to clarify by the Investigator, C5 stated that he had recently read the University's policy on consent, and believed that R5 had sexually assaulted him on XXXXX XX, 2015.  The University's definition of consent provided that the parties must have:

> affirmative, conscious, and voluntary agreement to engage in sexual activity.  It is the responsibility of each person involved in the sexual activity to ensure that they have the affirmative consent of the other or others to engage in the sexual activity.  Lack of protest or resistance does not mean consent, nor does silence mean consent.  Affirmative consent must be ongoing throughout a sexual activity and can be revoked at any time.  The existence of a dating relationship between the persons involved, or the fact of past sexual relations between them, should never by itself be assumed to be an indicator of consent.

The University's definition of sexual assault stated that it included sexual intercourse or sexual contact without consent where:

> there is no affirmative, conscious, or voluntary consent, or consent is not freely given; physical force, threats, coercion, or intimidation are used to overpower or control another, or the person assaulted fears that he or she, or another person, will be injured or otherwise harmed if he or she does not submit; or there is no ability to withhold consent due to incapacitation, whether due to the influence of alcohol or other drugs, age or mental capacity, being asleep, or unconsciousness.

On November X, 2015, the Investigator notified R5 that she was alleged to have violated the following sections of the *Student Conduct Code*: 11.53B, engaging in nonconsensual fondling, groping, or sexual contact including intentional contact with the intimate parts (breasts, genitals, buttocks, groin, or mouth) of another, causing another to touch one's intimate parts, or disrobing or exposure of another without permission; and 11.53C, engaging in actual or attempted nonconsensual physical sexual act including, but not limited to vaginal, oral, or anal penetration using a body part or object.

On November X, 2015, the Investigator notified both students that she had concluded Investigations #1 and #2, and a decision would be rendered subsequently by the Student Equity Review Panel (Review Panel).  At the time of the investigations, the University's then-current procedure provided that the investigator would make findings of fact, then the Review Panel was responsible for the decision of whether those factual

findings showed a violation of the relevant *Student Conduct Code* sanctions and assigning sanctions and remedies, if appropriate.

Investigation #3 incorporated relevant evidence from Investigations #1 and #2.  On November XX, 2015, R5 was interviewed regarding Investigation #3, and R5 reviewed the narrative and analysis provided by C5 on or about October X, 2015.  R5 said that both parties consented to the XXXXX XXXX sexual interaction, and that C5 was directing the sexual encounter by XXXXXXXX XXX XXXXXXXXX XXXXXX XXX XXXX XXXXXXXXX. She stated that she was not enjoying what he was doing, told him she did not want to continue, and they ceased sexual activity.  She again denied making any statements about his sexual performance or threats to "knock him out."  R5 stated that she did not offer nor request oral sex during the XXXXX XXXX sexual interaction.  R5 provided a message from C5 early the next morning in which he thanked her and expressed having enjoyed the interaction.

On December XX, 2015, the Investigator notified C5 and R5 that Investigation #3 was complete, and they would receive a decision later from the Review Panel.

The campus was on winter recess from December XX, 2015 through January XX, 2016.  On March XX, 2016, the Review Panel met and reached decisions on Investigations #1, #2, and #3 and issued one document for the consolidated investigations.  C5 and R5 were notified of the decisions on March XX, 2016.

In Investigation #1, the Review Panel concluded based on the preponderance of the evidence standard that C5 had harassed and sexually harassed R5, and directed C5 to attend counseling.  The Investigator's factual findings concluded that on XXXXX XX, 2015, C5 e-mailed R5 and wrote that they both knew what they were doing in the XXXXX XXXX sexual interaction was "wrong" because they had decided to have sex XXXXXX XX XXXXX XX XXXX XXX XXXXXXXXX XXXX XXX XXX XXXXXXXXXXXX XXXXXX XX XXXXX.   In this e-mail, C5 also stated that he would not tell the ex-boyfriend about the sexual contact.  C5 wrote that if he did tell the ex-boyfriend, he understood that it may seem like "revenge" against R5.  The documentary evidence also showed that, later, on or about XXX X 2015, C5 contacted R5's ex-boyfriend on social media and stated that he wanted to discuss an issue with him.  The ex-boyfriend responded, then contacted R5 to ask why C5 was contacting him.  R5 explained and the ex-boyfriend then blocked C5 from contacting him.  C5 created a new account using a pseudonym and contacted the ex-boyfriend again, XXXXXXXXXXX XXX XXXXXXXX XXX XXXX XX XXXXXX XXX XXX XXX XXXXXXXXXXX XXXXX XX.  C5 later asserted that this was a typographical error: he had meant to write that he XXX XXXXXXXXX XX XXXXX XXX XXXX XX XXXXXX XXX XXX XXX XXXXXXXXXXX XXX XXXXXX XX.  The ex-boyfriend told the Investigator that he found C5's attempts to contact him regarding R5 disturbing, and became concerned for R5's safety.  Several of the other students described that in verbal and social media conversations after the XXXXX XXXX sexual interaction, C5 expressed anger and affront that R5 had broken off further sexual interactions.

With respect to Investigation #2, the Review Panel concluded based on the preponderance of the evidence standard that there was insufficient evidence to support a finding that R5 sexually harassed C5.  The factual findings showed there was insufficient evidence to show that R5 made aggressive and/or unwelcome remarks during the XXXXX XXXX sexual interaction, or that R5 would have been aware that these communications were unwelcome, given prior communication via social media about their sexual interests, which included C5 stating in crude terms that he wanted to have sex with R5.  The Investigator also found that there was insufficient evidence to show that R5's physical contact with C5's arm on XXXXX XX, 2015 met the standard for harassment.

With respect to Investigation #3, the Review Panel concluded based on the preponderance of the evidence that there was insufficient evidence to support a finding that C5 sexually assaulted R5 because he was

under duress or withdrew his consent after XXXXXXXXX XXXX XXX XXXXXXXX.  The factual findings showed that the parties engaged in sex on XXXXX XX, 2015.  As described in the findings, after the parties XXXX XXX XXXXXXXX — which is where R5 alleged that he was threatened by C5 — and XXXXXXXX XX XXX, and according to C5's account, XXXX XXXXXXX XX XXXXXXXX XX XXXXXXXXXX XX XXX XXX XX XXXXXXXX XXXX XXXX XX XX XXXXXX XX XXX XXX XXXXXXXXX XXXX XX XXX XXXXXXX XXX XXXX XX XXXXXXX XXXXXX. According to both parties, C5 also asked R5 to spend the night, and the investigators reviewed two text messages sent the next day that also undermined C5's allegation of failure to give consent.   The Investigator also pointed to the fact that C5 had repeatedly referred to the XXXXX XXXX sexual interaction as consensual to witnesses prior to Investigations #1 and #2, as well as to Title IX staff and the Investigator during the investigation, and the context and timing of his report to the University regarding the allegations undermined C5's report.

During its investigation, OCR questioned University staff members about their analysis of C5's consent.  The Investigator explained that C5 consistently spoke about the XXXXX XXXX sexual interaction as consensual, until he submitted an e-mail in October 2015 which prompted Investigation #3.  He had referred to the encounter as consensual in the meeting with the Investigator and throughout Investigations #1 and 2, and also in written documents; he also had described it as consensual to multiple witnesses.  Both members of the Review Panel stated to OCR that they did not find credible C5's assertion that aspects of the sexual encounter were nonconsensual because the behavior he himself described about XXXXXXXXX XX XXX XXXXXXX and engaging in further sexual contact with R5 had not been consistent with that claim.

C5 appealed the investigation decision to the SBAP on April X, 2016.  His appeal focused on his allegation that the Investigator was biased against him as a male.  On April XX, 2016, the SBAP e-mailed the Title IX Coordinator with questions about the three investigations.  The last question asked "why [C5]'s conduct subsequent to his sexual encounter has been used to contradict his withdrawing of consent?  The SBAP notes that in past cases victims have acted [in] ways which seem to contradict their withdrawal of consent, and it has not in past cases been used against their credibility."  With respect to this question, the Title IX Coordinator explained that, "In evaluating consent issues, the totality of the evidence must be considered. Further, given the infinite complexity of human relations, it is the totality of the evidence in the specific case, between the specific parties, that is controlling."  The response then detailed how, for XXXXX XXXXXX from the time of the XXXXX XXXX sexual interaction, C5 had characterized it as consensual to witnesses and University staff.  The written response concluded that "[t]he numerous descriptions of a consensual sexual encounter to friends, cohorts, and authority figures (faculty and Title IX) cannot reasonably be described as instances of 'counter-intuitive' victim behavior when considered with the timeline of events, his conduct, his report of harassment . . . and his admissions of affront" as to R5's decision not continue with the relationship.

On May XX, 2016, the SBAP notified C5 and R5 of its decision, upholding the conclusions in Investigations #1, #2, and #3.

<u>Analysis and Conclusions of Law</u>

Regarding C5's allegation that the University failed to apply the definition of consent at the time when it found that he had consented to sexual contact with R5, OCR found that the investigators gathered evidence regarding the interactions between the parties and concluded that the evidence did not support that C5 was having sex under duress or withdrew consent, his actions close in time to the incident also did not suggest a lack of consent and his subsequent communications with other students and staff contradicted his allegation.  Additionally, the SBAP itself exercised due diligence to determine whether C5's delayed report of sexual assault was counter-intuitive behavior by asking written follow-up questions of the Title IX

Coordinator and the Investigator.  To the extent that C5 alleges that the University's investigation was
biased against him because he is male, OCR carefully reviewed the investigative files for each investigation
involving C5 and R5.  There was no evidence in the files that the Investigator treated C5 differently from R5,
or that R5 was treated more favorably by the University because she is female.  In addition, in interviews
with University staff members, they consistently explained why they did not find C5's reports of sexual
harassment and sexual assault credible.  OCR reviewed all of this information and did not find evidence of
bias or other discrimination based on sex in the University's investigation and appeal process regarding C5.

OCR found that C5 and R5 had many opportunities to provide information, and both students provided
evidence to the Investigator through interviews, documents, e-mails, and other evidence.  The Investigator
collected and reviewed all of the evidence submitted, and this is reflected in the final investigation report.
Both parties were given equivalent access to documents through the secure database.  For the above
reasons, OCR concluded that the investigations were equitable.

Investigations #1 and #2 were completed in approximately 300 days, and Investigation #3 was completed in
148 days.  The University explained that the reasons for the length were the complexity of the
investigations, witness availability, and the fact that the Title IX Office was undergoing a transition in
staffing.  OCR found that the three intertwined investigations were complex, were impacted by the summer
and winter recesses, and that C5 provided extensive evidence, which then would necessitate review by R5
to ensure equity.  The Investigator worked diligently until mid-November 2015 to complete Investigations
#1 and #2.  However, once the Investigator completed the factual findings for Investigations #1 and #2, it
took almost four more months for the Review Panel to meet and issue its findings on March XX, 2016.
Similarly, the Investigator completed the investigation of the allegations in Investigation #3 by December
XX, 2015, but the Review Panel did not render its decision for several more months, when it rendered its
decision on all three investigations.   OCR concluded that this lag between the conclusion of the
investigation and factual findings and the Review Panel's decision denied C5 and R5 a reasonably prompt
resolution.

Accordingly, OCR also found that there was sufficient evidence to support a finding that the University
failed to provide a prompt process.  OCR also found there was insufficient evidence to support a finding of
noncompliance with the respect to the provision of an equitable resolution process.

**Complaints of sexual harassment and sexual violence filed under the University's grievance process**

*Investigations Completed: Academic years 2010-2011 through 2014-2015*
OCR requested and the University provided copies of investigative determinations and supporting
documents for its investigation of sexual harassment and sexual violence complaints.  OCR reviewed 39
investigations completed in the 2010-2011 and 2011-2012 academic years, including summaries of
investigation findings and notices of sanctions.  For the 67 investigations completed in the 2012-2013,
2013-2014, and 2014-2015 (through May 12, 2015) academic years, OCR conducted a more detailed review
based on the University's detailed investigation reports for each matter.  The investigation reports provided
an iteration of allegations, including specific *Student Conduct Code* violations alleged, timelines of steps
completed in the investigation, witnesses interviewed and the information obtained, documents and other
evidence reviewed, analysis of all evidence gathered, legal findings, and sanctions (if any).

Based on its analysis of 65 out of 67 investigations,[16] OCR identified several compliance concerns:

---

[16] OCR's analysis herein excludes two matters in which the parties filed suit against the University during OCR's
investigation.  In October 2017, a State court set aside the University's September 2013 determinations and sanctions

In most cases, an investigation was initiated from a report made directly to the investigating office by the complainant, or, if reported to DPS, the report was directed to the investigating office.  There were examples of a complainant reporting to a responsible employee, who then promptly reported to the appropriate investigating office.  In one case, however, OCR identified a concern because the Title IX Coordinator was not promptly notified by DPS of a sexual assault allegation, which was reported on XXXXXX XX, 2013.  The investigation by the Title IX Office was not initiated until November XX, 2013, when the complainant reported her allegations directly to the Title IX Office.  The file does not contain any documentation showing that DPS ever reported the original allegation to the Title IX Coordinator.  Prior to completing its investigation related to this case of concern, the University expressed an interest in voluntary resolution, and OCR agreed it was appropriate to do so.

With respect to appeals where the student was a respondent (i.e., rather than faculty or staff)[17] in the 2012-2013, 2013-2014, and 2014-2015 academic years, the most prompt appeal was completed in 46 days, and the majority of appeals were completed in 90-100 days.  Because the appeal process generally required only a paper review and meeting of the appeal panel, OCR had a concern that the length of time to complete appeals was not prompt during those years.  However, during the 2015-2016 academic year, the University revised its policy to include a 45 day timeline for appeals.

With respect to interim measures during the pendency of the investigations, the documents reviewed included limited information that interim measures were provided to the parties.  OCR found references to avoidance of contact letters in some investigation reports.  OCR's interviews with University staff also provided evidence that the University did not have a coordinated system for providing such measures.  Staff members reported that different offices are responsible for determining and implementing interim measures, and that they do not coordinate their responses.  Another concern raised by OCR's review was the lack of information in the documents demonstrating that the University regularly considered and provided corrective measures to complainants and other students (as needed) to address the discriminatory effects, where the University found that sexual harassment or assault had occurred.  In the vast majority of cases where a violation finding was made, an avoidance of contact letter was implemented or continued as a remedy for the complainant, but the investigation reports and notices of outcome to complainants did not include whether any remedies were necessary to address the potential impact on the educational environment.

In one matter, a male student filed a complaint on XXXXXXX XX, 2013, regarding the Director of X XXXXXXX XXXXXXXX XXXXXX.  The complainant was seeking help XX XXXXXXXXXXXX XX XXXXXXXXXXX XXXXXXXXXX XXXXXXX and believed that the Director was able to assist.  The complainant alleged that when the Director initiated sexual activity, the male student did not consent to performing a sex act on the Director.  The complainant told the investigator that when the Director asked the male student afterwards whether he had wanted to perform the sex act, the complainant answered yes because he wanted the Director's assistance, and was fearful of the Director's authority.  After conducting an interview with the Director who confirmed that the sexual incident took place but stated it was consensual, the investigation concluded that the Director violated the University's policy against sexual harassment, and that given his unique influence over students XXXXXXXXX XXXXXXXXX, the complainant did not give consent.  The Director was sanctioned with XXXX XXXX XXXXX XXXXXXX XXX.  OCR identified a concern because there was no information

---

against a responding student, and remanded the matter to the University.  In May 2017, a State court denied a responding student's petition to set aside the University's May 2015 determinations and sanctions; this matter is currently on appeal.

[17] Excluding the cases of C1, C2, C3, C4, and C5, which were discussed infra.

regarding any interim measures for the complainant pending completion of the investigation or assessment of whether the student had been subjected to a hostile environment and had his access to the University's programs and activities limited as a result.  For these reasons and also based on the concerns raised in C4's case, OCR identified a concern that when the University had notice of limitations on a student's access to its programs and activities, the University may not have adequately considered and/or coordinated the implementation of appropriate interim measures or other remedies.   Prior to OCR completing its investigation related to these concerns, the University expressed an interest in voluntary resolution, and OCR agreed it was appropriate to do so.

F.   **Whether the University discriminated against C5 and other male students by denying counseling for sexual harassment and sexual violence at the Center for Women and Men (CWM)/Relationship and Sexual Violence Prevention and Services (RSVP) based on their sex in violation of 34 C.F.R. § 106.31.**

<u>Findings of Fact</u>

C5 alleged to OCR that he was denied sexual assault counseling from the University because he is male.  He also alleged that male victims of sexual assault, as a class, are denied counseling services by the University. The CWM/RSVP provides services to individuals who may have experienced sexual assault, including individual therapy, group therapy, and other support, as well as other educational and outreach programs to the University community.  The Director and Therapist explained to OCR that in order to join the group therapy, an individual self-identifies as a survivor of sexual trauma, and then completes an individual screening with the facilitator or co-facilitators for the group.   The screening for the group consists of structured questions and typically takes about 30 minutes.  Students cannot drop-in to group therapy; they must meet with a therapist and complete the screening in advance.

On XXXXXX, February XX, 2016, C5 went to CWM/RSVP with the intention of joining group therapy shortly before it was to start.  He first spoke with the front desk program assistant (Assistant) and asked her about the group.  The Assistant told OCR that typically she would set up a phone call with a staff member to talk with someone inquiring about the group, but the group facilitator was available at the time.  The group facilitator, a licensed marriage and family therapist employed by CWM/RSVP (Therapist), agreed to speak with C5.  The Therapist explained to OCR that she briefly explained the intake process and asked if it would be okay with him to schedule an appointment for the next week.  C5 agreed.

XXXXXX XXXX XXXXXXXXXX XX XXX XXXXXXXXX XXXXXX XXXXXXXXX XXX XXXXXX XXX XXXXXXXXX XXXXXXXX XXX XXXXX XXXX XXX XXXXXXX XXXXXXXXXX XXXXXX XXXXXX XXXXX XXX XXX XXXX XX XXXXXX XX XXX XXXX. XXX XXX XXXX XX XXX XXX XXXX X XXXXXXXXX XX XXXX XXX XXXX XXX XXXXXXXXXX XXXXXXXX XXX XXXXXXX XX XXX XXXXXXXX XXXXX XXXXX X XXXXXXXXXX XX X XXXXX XX XXXX.   Staff members at CWM/RSVP explained to OCR that when students request services, it is standard to complete two items before meeting with a therapist:  (1) a crisis assessment questionnaire; and (2) a computer-based questionnaire which enables CWM/RSVP to do an initial assessment and track outcome measures for their services.  The crisis assessment includes, among other things, a yes or no question on whether or not the student has been "recently physically or sexually assaulted" and also requests a brief statement of why the student has come to CWM/RSVP.  The University provided OCR with a copy of C5's crisis assessment completed on February XX, 2016.  He wrote down his name, student identification information, address, telephone number, and the date, but he did not complete any of the questions.  According to the CWM/RSVP staff whom OCR interviewed, C5 was reluctant to complete the computer-based questionnaire, but agreed to complete it after the Therapist discussed the purpose.

After C5 completed the questionnaire, he met privately with the Therapist.  XXX XXXXXXXXX XXXX XXX XXX XXXXX XX XXX XXXXXXXXXXXXXXXX XXXXXXXXXX XXXXX XXXX XXX XXXXX XX XXXX XXX XXXXXXX XXX XXX XXXXXX XX XXXXXXXX.  XX XXX XXX XXXXXXX XXXXXXX.  XXXXXXXX XX XXXXXX XXX XXXXX XX XXXXXXX XXXXXXX XXXXXXX XXXX XX XXX XXXXX XX XXXXXX.   XXX XXX XXXX XX XXX XXXXXXXX XX XXXXXXX XXXXXXXXXXXXXX.   She informed him incorrectly that CWM/RSVP would not provide services to XXXXXXXXXX students.  XXX-paragraph redacted-XXX.

The Director of CWM/RSVP told OCR that typically students who have been accused of sexual assault, regardless of sex, will be referred to SCS because they have more of a specialty in addressing the needs of respondent students than CWM/RSVP does.  OCR received information through interviews and other data about the utilization of CWM/RSVP services by male students.  In the 2014-2015 academic year, 381 students utilized the services of CWM/RSVP.  Three hundred of those students identified as female, 71 identified as male, and 10 declined to state a gender or sex identity.  Through June 1, 2016, a total of 557 students had accessed the services of CWM/RSVP in the 2015-2016 academic year.  Among that group, 438 identified as female, 117 identified as male, and 2 declined to state a gender or sex identity.  In addition to CWM/RSVP, the University also provides counseling services to students through SCS.  In the 2014-2015 academic year, 3,687 students utilized SCS services.  Of those, 2,173 identified as female, 1,509 identified as male, and 5 declined to state a sex or gender identity.  In the 2015-2016 academic year through June 1, 2016 a total of 3,935 students accessed SCS services, which included 2,436 female students, 1,493 male students, and 6 students who declined to state a sex or gender identity.

<u>Analysis and Conclusions of Law</u>

OCR found that the Therapist's incorrect statement that CWM/RSVP did not provide services to respondent students did not result in a denial of services to C5 based on sex.  Rather, following the initial intake, C5 was not provided group counseling services by CWM/RSVP because he did not explain that he believed he was sexually assaulted by R5.  He failed to complete the written crisis paperwork aside from writing his name, contact information and date, which included a question about what brought him to CWM/RSVP, XXX XXXX XXXXX XXXXXXXXXXXX XX XXX XXXXXXXXX XX XXX XXX XXXXXX XXX XXXXXXXXX.  Instead, XX XXXXXXXX XXXXXXX XXXXXXXXX XXX XXXXX XX XXXXXXXXXXXXXX.  Further, OCR found that male students access the services of CWM/RSVP in both individual and group therapy.  OCR, therefore, concluded that C5 was denied counseling from CWM/RSVP because he did not provide relevant information in his intake interview and not because of his sex.  With respect to his allegation that CWM/RSVP categorically denies counseling services to male students, OCR found that the data provided by the University showed that male students do receive group and individual counseling services through CWM/RSVP.  Therefore, OCR found insufficient evidence of noncompliance with respect to this allegation.  However, as a matter of technical assistance, OCR recommends that the University review its materials, intake and other resources, and programs to ensure that they provide equitable notice to all students, regardless of sex, that CWM/RSVP is available to provide support to students who have experienced sexual assault or other sexual trauma.

<u>OVERALL CONCLUSION</u>

The University has entered into the enclosed Agreement to address the compliance concerns and violations identified in these consolidated matters.  The Agreement requires the University to:  review and revise its notice of nondiscrimination on the basis of sex and policies and procedures governing sexual harassment to ensure compliance with Title IX; provide notice of Title IX policy and procedure revisions to the University community and training to those handling the University's response to complaints; and submit periodic self-monitoring assessments on the University's handling of reports of sexual harassment and sexual violence.

This concludes OCR's investigation of these consolidated OCR complaints and should not be interpreted to address the University's compliance with any other regulatory provision or to address any issues other than those addressed in this letter.  This letter sets forth OCR's determination in these consolidated OCR cases.  This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such.  OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.  OCR is closing the investigation of the consolidated complaints as of the date of this letter, and notifying the complainants concurrently.  Complainants may have the right to file a private suit in Federal court whether or not OCR finds a violation.

OCR will monitor the implementation of the Agreement until the University is in compliance with the statute(s) and regulations which were at issue in the case.  When fully implemented, the Agreement is intended to address all of OCR's compliance concerns in this investigation.

Please be advised that the University may not harass, coerce, intimidate, retaliate, or discriminate against any individual because he or she has filed a complaint or participated in the complaint resolution process.  If this happens, the individual may file another complaint alleging such treatment.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request.  In the event that OCR receives such a request, we will seek to protect, to the extent provided by the law, personally identifiable information which, if released, could reasonably be expected to constitute an unwarranted invasion of personal privacy.

Thank you for your cooperation in resolving this case.  If you have any questions regarding this letter, please contact Jenny Moon or Laura Welp at the San Francisco OCR office at (415) 486-5555.

Sincerely,

/s/

Laura Faer
Regional Director

Enc.

Cc:  Kelly Bendell, Esq.
      Associate General Counsel

      Leslie Gomez, Esq.
      Cozen O'Connor

      Gina Maisto Smith, Esq.
      Cozen O'Connor